UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRIAN FORD,                                    :
                                               :
                    Plaintiff,                 :        Case No.: _____
                                               :
        -against-                              :        **COMPLAINT**
                                               :
RAYTHEON COMPANY, THOMAS A.                    :        **DEMAND FOR JURY TRIAL**
KENNEDY, TRACY A. ATKINSON,                    :
ROBERT E. BEAUCHAMP, ADRIANE M.                :
BROWN, STEPHEN J. HADLEY, LETITIA              :
A. LONG, GEORGE R. OLIVER, DINESH C.           :
PALIWAL, ELLEN M. PAWLIKOWSKI,                 :
WILLIAM R. SPIVEY, MARTA R.                    :
STEWART, JAMES A. WINNEFELD, JR.,              :
and ROBERT O. WORK,                            :
                                               :
                    Defendants.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Brian Ford ("Plaintiff"), by his undersigned attorneys, alleges upon personal

knowledge with respect to himself, and information and belief based upon, *inter alia*, the

investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Raytheon Company ("Raytheon" or

the "Company") and the members of the Company's board of directors (collectively referred to as

the "Board" or the "Individual Defendants" and, together with Raytheon, the "Defendants") for

their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and

Item 1015 of Regulation M-A, 17 C.F.R. 229.1015,  in connection with the proposed merger (the

"Proposed Merger") between Raytheon and United Technologies Corporation ("UTC").

2.      On June 9, 2019, Raytheon entered into an Agreement and Plan of Merger (the

"Merger Agreement"), pursuant to which the Company's shareholders will receive 2.3348 fully

1

paid and nonassessable shares of UTC common stock in exchange for each share of Raytheon common stock they own (the "Merger Consideration"). The Proposed Merger is conditioned on the prior completion of UTC's previously announced separation of its commercial businesses, Otis and Carrier, from its other businesses and the pro rata distributions to its shareowners of 100% of the common stock of the corporation holding the Otis business, or Otis SpinCo, and 100% of the common stock of the corporation holding the Carrier business, or Carrier SpinCo. The Merger Agreement provides that, as of the completion of the Proposed Merger, the name of UTC will be changed to Raytheon Technologies Corporation and the common stock of the combined company will be listed on the NYSE under the symbol "RTX."

3.      On July 17, 2019, in order to convince Raytheon's shareholders to vote in favor of the Proposed Merger, Defendants authorized the filing of a materially incomplete and misleading joint proxy statement/prospectus on Form S-4 (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Raytheon, UTC, and the combined company; (ii) the valuation analyses performed by Raytheon's financial advisors, Citigroup Global Markets Inc. ("Citigroup") and RBC Capital Markets, LLC ("RBC" and together with Citigroup, the "Financial Advisors"), in support of their fairness opinions; and (iii) the conflicts of interest faced by the Financial Advisors.

5.      The special meeting of Raytheon shareholders to vote on the Proposed Merger is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed prior to special meeting of Raytheon's shareholders to vote on the Proposed Merger so Plaintiff can cast an informed vote and properly exercise his corporate suffrage rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against

Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger until the material information discussed herein is disclosed to Raytheon's shareholders sufficiently in advance of the special meeting of Raytheon's shareholders or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

<u>**JURISDICTION AND VENUE**</u>

7.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman* 764 F.2d 1309, 1305 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* At 1316

9.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Raytheon's common stock trades on New York Stock Exchange, which is headquartered in this District, and Raytheon hired Shearman & Sterling as a legal advisor and Citigroup as a financial advisor for the purposes of the Proposed Merger, both of which are also headquartered

in this District, rendering venue in this District appropriate.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and at all relevant times has been, a holder of Raytheon common stock.

11.     Defendant Raytheon is incorporated in Delaware and maintains its principal executive offices at 870 Winter Street, Waltham, Massachusetts 02451. Raytheon develops technologically advanced and integrated products, services, and solutions for defense and related programs for government customers. The Company's common stock trades on the NYSE under the ticker symbol "RTN".

12.     Individual Defendant Thomas A. Kennedy is, and has been at all relevant times, a director of Raytheon, Chairman of the Board, and the Chief Executive Officer of the Company.

13.     Individual Defendant Tracy A. Atkinson is, and has been at all relevant times, a director of Raytheon.

14.     Individual Defendant Robert E. Beauchamp is, and has been at all relevant times, a director of Raytheon.

15.     Individual Defendant Adriane M. Brown is, and has been at all relevant times, a director of Raytheon.

16.     Individual Defendant Stephen J. Hadley is, and has been at all relevant times, a director of Raytheon.

17.     Individual Defendant Letitia A. Long is, and has been at all relevant times, a director of Raytheon.

18.     Individual Defendant George R. Oliver is, and has been at all relevant times, a director of Raytheon.

19.     Individual Defendant Dinesh C. Paliwal is, and has been at all relevant times, a

director of Raytheon.

20.     Individual Defendant Ellen M. Pawlikowski is, and has been at all relevant times, a director of Raytheon.

21.     Individual Defendant William R. Spivey is, and has been at all relevant times, a director of Raytheon.

22.     Individual Defendant Marta R. Stewart is, and has been at all relevant times, a director of Raytheon.

23.     Individual Defendant James A. Winnefeld, Jr. is, and has been at all relevant times, a director of Raytheon.

24.     Individual Defendant Robert O. Work is, and has been at all relevant times, a director of Raytheon.

25.     The Individual Defendants referred to in paragraphs 12-24 are collectively referred to herein as the "Individual Defendants" and/or the "Board", together with Raytheon they are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.      The Proposed Merger**

26.      Raytheon, incorporated on December 17, 1953, is a technology company, which specializes in defense and other government markets. The Company develops integrated products, services and solutions in various markets, including sensing; effects; command, control, communications, computers, cyber, and intelligence; mission support; and cybersecurity. The Company operates through five segments: Integrated Defense Systems; Intelligence, Information and Services; Missile Systems; Space and Airborne Systems, and Forcepoint. The Company serves both domestic and international customers, primarily as a prime contractor or subcontractor on a range of defense and related programs for government customers.

27.     UTC, incorporated on July 21, 1934, is engaged in providing high technology products and services to the building systems and aerospace industries around the world. The Company operates through four segments: Otis; UTC Climate, Controls & Security; Pratt & Whitney; and UTC Aerospace Systems. Otis, UTC Climate, and Controls & Security serve customers in the commercial, government, infrastructure and residential property sectors and transport and refrigeration businesses around the world. Pratt & Whitney and UTC Aerospace Systems primarily serve commercial and government customers in both the original equipment and aftermarket parts and services markets of the aerospace industry.

28.     On June 9, 2019, Raytheon and UTC issued a joint press release announcing the Proposed Merger, which states in relevant part:

**Raytheon and United Technologies Aerospace Businesses
to Combine in Merger of Equals**

- **Combination will create a premier systems provider with advanced technologies to address rapidly growing segments of aerospace and defense**

- **Expanded technology and R&D capabilities to deliver innovative and cost-effective solutions aligned with customer priorities**

- **Significant near- and long-term benefits expected from uniting complementary portfolios of platform-agnostic capabilities, resulting in more than $1 billion of gross annual cost synergies by year four, as well as new revenue opportunities from combined technology**

- **Return of capital to shareowners expected to be $18 to $20 billion in first 36 months following completion of the merger**

- **United Technologies' separation into three independent companies remains on track; merger is expected to be tax-free and close in the first half of 2020, following completion of UTC portfolio separation**

WALTHAM, Mass. and FARMINGTON, Conn., June 9, 2019 – Raytheon Company (NYSE: RTN) and United Technologies Corp. (NYSE: UTX) have entered into an agreement to combine in an all-stock merger of equals.  The transaction will create a premier systems provider with advanced technologies to address rapidly growing segments within aerospace and defense. The merger of Raytheon, a leading defense company, and United Technologies, a leading

aerospace company, comprised of Collins Aerospace and Pratt & Whitney, will offer a complementary portfolio of platform-agnostic aerospace and defense technologies. The combined company, which will be named Raytheon Technologies Corporation, will offer expanded technology and R&D capabilities to deliver innovative and cost-effective solutions aligned with customer priorities and the national defense strategies of the U.S. and its allies and friends. The combination excludes Otis and Carrier, which are expected to be separated from United Technologies in the first half of 2020 as previously announced.

The combined company will have approximately $74 billion in pro forma 2019 sales. With a strong balance sheet and robust cash generation, Raytheon Technologies will enjoy enhanced resources and financial flexibility to support significant R&D and capital investment through business cycles.

Under the terms of the agreement, which was unanimously approved by the Boards of Directors of both companies, Raytheon shareowners will receive 2.3348 shares in the combined company for each Raytheon share. Upon completion of the merger, United Technologies shareowners will own approximately 57 percent and Raytheon shareowners will own approximately 43 percent of the combined company on a fully diluted basis. The merger is expected to close in the first half of 2020, following completion by United Technologies of the previously announced separation of its Otis and Carrier businesses. The timing of the separation of Otis and Carrier is not expected to be affected by the proposed merger and remains on track for completion in the first half of 2020. The merger is intended to qualify as a tax-free reorganization for U.S. federal income tax purposes.

"Today is an exciting and transformational day for our companies, and one that brings with it tremendous opportunity for our future success. Raytheon Technologies will continue a legacy of innovation with an expanded aerospace and defense portfolio supported by the world's most dedicated workforce," said Tom Kennedy, Raytheon Chairman and CEO. "With our enhanced capabilities, we will deliver value to our customers by anticipating and addressing their most complex challenges, while delivering significant value to shareowners."

"The combination of United Technologies and Raytheon will define the future of aerospace and defense," said Greg Hayes, United Technologies Chairman and CEO. "Our two companies have iconic brands that share a long history of innovation, customer focus and proven execution. By joining forces, we will have unsurpassed technology and expanded R&D capabilities that will allow us to invest through business cycles and address our customers' highest priorities. Merging our portfolios will also deliver cost and revenue synergies that will create long-term value for our customers and shareowners."

**Combination to Create Long-Term Value**

- <u>Balanced and diversified aerospace and defense portfolio that is resilient across business cycles</u>: The merger establishes a broad and complementary portfolio of platform-agnostic capabilities across the high-growth segments

of aerospace and defense, reducing risk of concentration in any individual platform or program.

- Highly complementary technology and R&D platform: With a combined annual company and customer funded R&D spend of approximately $8 billion, seven technology Centers of Excellence, and over 60,000 engineers, the company will develop new, critical technologies faster and more efficiently than ever before. Areas of joint advancement include, but are not limited to: hypersonics and future missile systems; directed energy weapons; intelligence, surveillance, and reconnaissance (ISR) in contested environments; cyber protection for connected aircraft; next generation connected airspace; and advanced analytics and artificial intelligence for commercial aviation.

- Attractive financial profile with strong cash flow generation and balance sheet: Robust free cash flow growth and a strong balance sheet will support continued investment and return of capital to shareowners. The combined company expects to return $18 to $20 billion of capital to shareowners in the first 36 months following completion of the merger. As a result of the combination, the company also expects to capture more than $1 billion in gross annual run-rate cost synergies by year four post-close, with approximately $500 million in annual savings returned to customers. In addition, the combination presents significant long-term revenue opportunities from technology synergies.

- Complementary company culture: The combined company will have a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility. Employees will have expanded opportunities for career development and advancement in high-growth areas, as well as ongoing engagement in local communities.

**Pro Forma Business Structure**

Raytheon plans to consolidate its four businesses into two businesses to be named Intelligence, Space & Airborne Systems and Integrated Defense & Missile Systems. The new businesses will join Collins Aerospace and Pratt & Whitney to form the four businesses of Raytheon Technologies.

**Pro Forma Capital Structure**

Net debt for the combined company at the time of closing is expected to be approximately $26 billion, with United Technologies expected to contribute approximately $24 billion. The combined company targets an 'A' category credit rating at the time of the closing.

**Leadership and Governance**

The combined company's Board of Directors will be comprised of 15 members, consisting of 8 directors from United Technologies and 7 from Raytheon, with the lead director from Raytheon. Tom Kennedy will be appointed Executive Chairman and Greg Hayes will be named CEO of Raytheon Technologies. Two years

following the close of the transaction, Hayes will assume the role of Chairman and CEO.

Raytheon Technologies will be headquartered in the greater Boston metro area, and will retain a corporate presence in existing locations. The company will be led by a highly experienced, proven leadership team with a strong track record of innovation, delivering on synergies, and meeting financial and customer commitments.

**Timing and Closing**

The transaction is subject to the satisfaction of customary closing conditions, including receipt of required regulatory approvals, the approval of Raytheon and United Technologies shareowners, as well as completion by United Technologies of the separation of its Otis and Carrier businesses.  As previously mentioned, the transaction is expected to close in the first half of 2020.

**2019 Financial Outlook**

There is no change to either Raytheon's or United Technologies' financial outlook for 2019.

29.     The Merger Consideration represents inadequate compensation for Raytheon shares. Indeed, on July 25, 2019, Raytheon reported second quarter 2019 results, beating expectations and increasing full-year 2019 guidance for sales, EPS, and operating cash flow. The company announced net sales rose 8% year-over-year to $7.2B, EPS from continuing operations of $2.92, up 5%, and record bookings of $9.5B, up 9%, resulting in a book-to-bill ratio of 1.32. Defendant Kennedy made the following statement: "The company had very strong second quarter operating results, with our bookings, sales, operating margin, EPS, and cash flow all exceeding our expectations. We begin the second half with continued confidence in our growth outlook given our innovative technologies, breadth of franchises, and record backlog." Given the Company's strong recent financial performance and bight economic outlook, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

## II.    The Proxy Omits Material Information

30.    On July 17, 2019, Defendants filed the materially incomplete and misleading Proxy with the SEC.  The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents an/or omits material information that is necessary for the Company's shareholders to make an informed decision in connection with the Proposed Merger.

The Misleadingly Incomplete Financial Projections

31.    First, the Proxy discloses a single metric, "Run Rate" year ended December 31, 2023, for the synergies projected to result from the Proposed Merger but entirely omits the financial projections for the pro forma combined company giving effect to the Proposed Merger (the "Pro Forma Projections"). In connection with rendering their fairness opinion and performing its underlying financial analyses, Citigroup "evaluated certain potential pro forma financial effects of the merger, the separation and the distributions." Proxy at 95. And in connection with rendering their fairness opinion and performing its underlying financial analyses, RBC "reviewed the relative financial contributions of Raytheon and the UTC aerospace businesses to certain financial metrics of the pro forma combined company." Proxy at 104.

32.    Additionally, on pages 69-71 of the Proxy, the Board listed the "material" positive factors for recommending Raytheon shareholders vote in favor of the Proposed Merger, including the following:

- The fact that the combination will create a premier systems provider, with advanced technologies to address the rapidly growing aerospace and defense segments, that will have a balanced and diversified aerospace and defense portfolio of platform-agnostic capabilities that is expected to be resilient across business cycles;

- The significant near- and long-term benefits expected to result from combining Raytheon's and UTC's complementary technologies, including the expectation

that the combined company will be able to leverage combined annual company-
and customer-funded research and development expenditures of approximately
$8 billion initially and the capabilities of over 60,000 engineers to develop new,
critical technologies more quickly and efficiently than either company could on
its own;

- The expectation that more than $1 billion in gross annual run-rate cost synergies
  will be realized by the fourth year following the completion of the merger, and
  UTC's successful track record in realizing anticipated synergies from its recent
  business combination transactions;

- The potentially significant accelerated or incremental long-term revenue
  opportunities expected to be generated from combining the technologies of both
  companies;

- The expectation that the combined company will be well-capitalized, generate
  robust free cash flow and have a strong balance sheet that will support both
  continued investment and facilitate the return of significant amounts of capital
  to its shareowners;

. . .

- The opportunity that Raytheon stockholders will have to participate in the future
  performance of the combined company, including the revenue and cost
  synergies realized as a result of the combination, because holders of outstanding
  shares of Raytheon common stock as of immediately prior to the completion of
  the merger will hold approximately 43% of the outstanding UTC common stock
  immediately after completion of the merger;

Proxy at 69-70.

33.     The Pro Forma Projections served as a primary reason for the Board to approve

and recommend the Proposed Merger and for the Financial Advisors to find the Merger

Consideration "fair" to Raytheon shareholders. The Pro Forma Projections are plainly material and

speak squarely to the question that the Company's shareholders must answer in determining how

to vote on the Proposed Merger: is a smaller stake in the combined company more or less valuable

than a full stake in the standalone company? Without the Pro Forma Projections, Defendants

present the Company's shareholders with only a fraction of the equation, rendering them unable

to answer this question and assess the fairness of the Proposed Merger.

34.     Second, the Proxy omits critical financial projections, including the net income projections for Raytheon, UTC, and the Pro Forma combined company (the "Net Income Projections"). Defendants elected to summarize the projections for Raytheon, UTC, and a synergy metric of the combined company in the Proxy, but they excised and failed to disclose the Net Income Projections. By disclosing these projections in the Proxy and withholding the Net Income Projections, Defendants render the tables of projections on pages 112-116 of the Proxy materially incomplete and provide a misleading valuation picture of Raytheon.  Simply put, net income projections are irreplaceable when it comes to fully, fairly, and properly understanding a company's projections and value.

35.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections relied upon by the Financial Advisors and the Board but have omitted the Pro Forma Projections and the Net Income Projections. Thus, their omission renders the projections disclosed and the summary of the Board's *Recommendation and Reasons for the Merger* included in the Proxy misleading.

The Misleadingly Incomplete Summary of the Financial Advisors' Fairness Opinion

36.     The Proxy describes the Financial Advisors' fairness opinions and the various valuation analyses performed in support of their opinions.  Defendants concede the materiality of this information in citing each of the Financial Advisors' fairness opinions among the "material"

factors the Board considered in making its recommendation to Raytheon shareholders. Proxy at 70-71. However, the summary of the Financial Advisors' fairness opinions and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Raytheon's shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Financial Advisors' fairness opinions in determining how to vote on the Proposed Merger. This omitted information, if disclosed, would significantly alter the total mix of information available to Raytheon's shareholders.

37.     In summarizing the Discounted Cash Flow Analyses prepared by the Financial Advisors, the Proxy fails to disclose the following key information used in each analysis: (i) the actual inputs and assumptions underlying all the various discount rate ranges (including the values of the WACC and CAPM components); (ii) the actual terminal values calculated; (iii) the value of the FV Adjustments of Raytheon as of March 31, 2019 Citigroup used to adjust Raytheon's equity value; (iv) the value of the expected cash dividends and share repurchases Citigroup used to further adjust Raytheon's equity value; and (v) the value of the FV Adjustments of RemainCo as of March 31, 2019 Citigroup used to adjust RemainCo's equity value.

38.     These key inputs are material to Raytheon shareholders, and their omission renders the summary of the Discounted Cash Flow Analyses incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

39.    Without the above-omitted information Raytheon shareholders are misled as to the reasonableness or reliability of the Financial Advisors' analyses, and unable to properly assess the fairness of the Proposed Merger.  As such, these material omissions render the summary of the Discounted Cash Flow Analyses included in the Proxy misleading.

40.    Moreover, with respect to Citigroup's *Pro Forma Discounted Cash Flow Analysis*, the Proxy fails to provide a fair summary of the analysis. In fact, the summary of this analysis fails to include any valuations, or any numbers at all. The summary merely concluded: "which indicated, after adjusting for the pro-rata share of pro forma equity value attributable to holders of Raytheon common stock, that the transactions *could* have a positive impact on the implied equity value reference range of Raytheon calculated on a standalone basis." Proxy at 102 (emphasis added). This statement is misleading on its face. Without disclosing the valuations underlying this conclusion, Raytheon shareholders are misled—and confused—about the meaning of this statement.

41.    Next, in summarizing each of the Financial Advisors' *Selected Public Companies* Analyses, the Proxy fails to disclose the individual multiples for each company utilized in the analyses. A fair summary of a comparable companies or transactions analysis requires the

disclosure of the individual multiples for each company or transaction used. Merely providing the range that a banker applied is insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of each analysis provided in the Proxy misleading.

42.     Similarly, the Proxy purports to summarize an analyst price target analysis for each of the Financial Advisors without identifying the price targets observed. For the same reasons as stated in connection with the *Companies* analyses, shareholders are unable to assess whether the banker fairly summarized the price targets, or, instead, selectively disclosed only certain targets in order to present the Merger Consideration in the most favorable light. Accordingly, the omission of this material information renders the summary of this analysis provided in the Proxy misleading. Furthermore, the summary of RBC's analysis also omits the discount rate used to adjust the price targets downwards. Aside from the questionable practice of discounting a price target which already fails to account for any type of transaction premium, the failure to disclose how—or by how much—the implied value range was discounted further renders the summary misleadingly incomplete.

The Financial Advisors' Conflicts of Interest

43.     The Proxy fails to disclose the amount of compensation the Financial Advisors received or expect to receive for their investment banking and/or financial services prior to unrelated to the Proposed Merger. Disclosure of "relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4). Such information is undoubtedly material to Raytheon shareholders. It is imperative for shareholders to be able to understand what

factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the transaction to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

44.     On page 102 the Proxy states "Citigroup and its affiliates in the past have provided, currently provide, and in the future may provide, services to Raytheon and UTC (including, in the future, UTC RemainCo), *for which services Citigroup and its affiliates have received, expect to receive and would expect to receive compensation*, including, without limitation, during the two-year period prior to the date hereof, (1) having acted for UTC in March 2019 as joint lead arranger and joint bookrunner on a $2.0 billion revolving credit facility and $4.0 billion term credit facility and (2) having acted as lender to each of Raytheon and UTC." (emphasis added). Yet, inexplicably, the Proxy fails to disclose the amount of compensation Citigroup expects to receive in connection with such services. Instead, merely stating, "In the two-year period ended May 31, 2019, Citigroup and its affiliates derived no revenues from Raytheon and its affiliates, and derived aggregate revenues of approximately $0.3 million from UTC and certain of its affiliates, for investment banking services unrelated to the transactions." Even if this statement is literally true, it flies in the face of the disclosure requirements of the Exchange Act and misleads shareholders as to the nature of Citigroup's relationship with both Raytheon and UTC and the conflicts of interests Citigroup faces. Therefore, the omission of the amount of compensation Citigroup expects to receive renders the statements provided on page 102 of the Proxy, and potentially the Citigroup's fairness opinion,

incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

45.    Similarly, page 110 of the Proxy states "RBC Capital Markets and its affiliates currently are providing certain services to Raytheon and/or its affiliates unrelated to the merger and in the future may provide services to Raytheon and/or its affiliates, *for which services RBC Capital Markets and its affiliates would expect to receive compensation*." (emphasis added). This statement omits both the amount of compensation RBC expects to receive for its services and nature of the services being provided. Therefore, the omission of this material information renders the statements provided on page 110 of the Proxy, and potentially the RBC's fairness opinion, incomplete and misleading, and in violation of 17 C.F.R. § 229.1015(b)(4).

46.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming special meeting of Raytheon shareholders, Plaintiff will be unable to make an informed decision regarding the Proposed Merger, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

47.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

49.      Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

50.      Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

51.      The omission of information from a proxy will violate Section 14(a) if other SEC regulations specifically require disclosure of the omitted information.

52.      Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Merger.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Raytheon, UTC, and the combined company; (ii) the valuation analyses performed by the Financial Advisors in support of their fairness opinions; and (iii) the conflicts of interest faced by the Financial Advisors.

53.      In so doing, Defendants made misleading statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants,

18

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that the Financial Advisors  reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the financial projections and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

56.     Raytheon is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

57.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote on the Proposed Merger if such misrepresentations and omissions are not corrected prior to the special meeting of Raytheon's shareholders.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

58.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of Raytheon within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Financial Advisors, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the

content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

62.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the special meeting of Raytheon shareholders to vote on the Proposed Merger or consummating the Proposed Merger, until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 25, 2019                                **MONTEVERDE & ASSOCIATES PC**

                                                  */s/ Juan E. Monteverde*
                                                 Juan E. Monteverde (JM-8169)
                                                 The Empire State Building
                                                 350 Fifth Avenue, Suite 4405
                                                 New York, NY 10118
                                                 Tel: (212) 971-1341
                                                 Fax: (212) 202-7880
                                                 Email: jmonteverde@monteverdelaw.com


                                                 *Attorneys for Plaintiff*